# Illinois Official Reports

## Appellate Court

---

### *JP Morgan Chase Bank, National Ass'n v. Talaganov*,
### 2018 IL App (1st) 180578

---

| | |
|---|---|
| Appellate Court Caption | JP MORGAN CHASE BANK, NATIONAL ASSOCIATION, Successor by Merger to Chase Home Finance LLC, Successor by Merger to Chase Manhattan Mortgage Corporation, Successor by Merger With Chase Mortgage Company-West, f/k/a Mellon Mortgage Company, Plaintiff, v. BOZIDAR TALAGANOV a/k/a Bob Talaganov; KAZIMIERA TALAGANOV; JP MORGAN CHASE BANK, N.A.; RBS CITIZENS, NATIONAL ASSOCIATION, Successor by Merger to Charter One Bank, N.A.; UNKNOWN OWNERS and NONRECORD CLAIMANTS; Defendants (Kazimiera Talaganov, Defendant-Appellant; RBS Citizens, National Association, Successor by Merger to Charter One Bank, N.A., Defendant-Appellee). |
| District & No. | First District, Sixth Division<br>Docket No. 1-18-0578 |
| Filed | November 2, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CH-12232; the Hon. Moshe Jacobius, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Law Offices of Jacobson and Tchernev, Ltd., of Chicago (Ivo Tchernev, of counsel), for appellant. |
| --- | --- |
| | The Wirbicki Law Group, LLC, of Chicago (Thomas J. Cassady, of counsel), for appellee. |

| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Cunningham and Connors concurred in the judgment and opinion. |
| --- | --- |

**OPINION**

¶ 1    Defendant-appellant, Kazimiera Talaganov, appeals the order of the circuit court granting defendant-appellee RBS Citizens, National Association's (RBS), petition for turnover of surplus funds. On appeal, she contends that the court erred in allowing RBS to prove-up its lien more than 30 days after the order approving sale, where RBS did not seek a relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2016)). For the following reasons, we affirm.

¶ 2                                    JURISDICTION

¶ 3    The trial court granted RBS's petition on February 15, 2018. Talaganov filed her notice of appeal on March 15, 2018. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017) governing appeals from final judgments entered below.

¶ 4                                    BACKGROUND

¶ 5    JP Morgan Chase Bank, National Association (JP Morgan Chase), filed a mortgage foreclosure action that included as defendants Talaganov, as mortgagor, and RBS. RBS filed an appearance and answer to the complaint, admitting that "it has an interest in the subject property by virtue of a Mortgage executed on March 16, 2006 *** in the amount of $179,300.00 to Charter One Bank, N.A." RBS further admitted that "its lien is inferior only to that of the Plaintiff." RBS requested that "its interest in the subject property be recognized as a valid and subsisting lien on the subject premises and that in the event that a judgment is entered in this cause, that its lien be included in said judgment." RBS also requested that it be entitled to any surplus funds. Talaganov did not file an appearance or answer.

¶ 6    On December 12, 2013, the circuit court entered a judgment of foreclosure (JOF) and a default order against Talaganov. The JOF stated that RBS "has a valid and subsisting lien in the amount of $179,300.00, which lien is junior to the lien of the Plaintiff." Prior to the scheduled judicial sale, Talaganov filed a motion to vacate the JOF, which the trial court granted. On April 21, 2014, Talaganov filed an answer to JP Morgan Chase's complaint and,

in response to paragraph 3(L) involving RBS's lien, stated that they "do not answer this section as Plaintiff does not make a factual allegation."

¶ 7      JP Morgan Chase filed a motion for summary judgment against defendants on November 4, 2015. RBS did not file a response, nor did it attend or participate in the hearing. After the hearing, the circuit judge Anna Loftus entered a JOF in favor of JP Morgan Chase and against defendants Talaganov and RBS. In the order, Judge Loftus found that RBS "has a valid and subsisting lien in the amount TBD, which lien is junior to the lien of the Plaintiff." The order also provided that "remittance of any surplus [is] to be held by the person appointed by the court to conduct the sale until further order of the court, pursuant to 735 ILCS 5/15-1512(d)."

¶ 8      Judge Loftus entered an order approving report of sale and distribution and possession on September 22, 2016. After the judicial sale, a surplus of $66,043.74 remained. The order approving sale provided that the surplus "be turned over to the Circuit Clerk of Cook to hold pending court order of its distribution."

¶ 9      On November 15, 2016, RBS filed a petition for turnover of surplus funds with the presiding judge of the chancery division, Judge Moshe Jacobius. Attached to the petition was an affidavit indicating an amount owed to RBS by Talaganov of $182,657.84. Judge Jacobius continued the petition so that RBS could obtain an order from Judge Loftus setting forth the specific amount due to RBS. On February 1, 2017, RBS filed a motion to determine lien amount before Judge Loftus, and the judge struck the motion for lack of jurisdiction. The court found that Judge Jacobius's order "requires RBS to have an adjudicated lien to present for distribution" but does not "revest this Court with jurisdiction to effectuate an adjudication" because more than 30 days have passed since the order approving sale was entered. It reasoned that "an adjudication of RBS's lien would require a new, substantive ruling, and can identify no authority for the proposition that it may do so without jurisdiction."

¶ 10      After this ruling, Talaganov filed a petition for distribution of proceeds of sale and surplus before Judge Jacobius. RBS also filed a petition for turnover of surplus funds. Judge Jacobius granted RBS's petition and denied Talaganov's petition. In the order, the judge found that a petition for turnover of surplus funds

> "is a separate proceeding under Section 15-1512(d) and General Administrative Order (GAO) 2003-03. These provisions allow this Court to Disburse [*sic*] surplus funds well beyond 30 days after an order approving sale has been entered. While these provisions do not allow this Court to amend or rescind the Judgment of Foreclosure or Order Approving Sale, these provisions also do not bar the Court from considering new evidence in support of a Petition for Turnover of Surplus Funds."

Since Talaganov did not deny RBS's lien amount of $179,300 and RBS's lien priority had been established by the JOF, RBS was entitled to the surplus funds. Talaganov filed this timely appeal.

¶ 11                               ANALYSIS

¶ 12      In general, this court will not disturb the circuit court's order of distribution of the surplus absent an abuse of discretion. *JP Morgan Chase Bank, N.A. v. Bank of America, N.A.*, 2015 IL App (1st) 140428, ¶ 42. Talaganov, however, raises the issue of the circuit court's

jurisdiction to grant RBS's surplus petition, and her argument utilizes section 15-1512 of the Code. "Questions relating to the circuit court's jurisdiction and the interpretation of a statute both present issues of law, which we review *de novo*." *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 25.

¶ 13    Talaganov contends that Judge Jacobius erred in determining the amount of RBS's lien and granting RBS's petition for the turnover of surplus funds, where RBS failed to prove up the amount of its lien within 30 days of the order approving sale. She argues that since the JOF listed RBS's lien amount as "TBD," determination of that amount was an improper modification of the JOF because it was made more than 30 days after entry of the order approving sale. See 735 ILCS 5/2-1203 (West 2016) (requiring that if a party wants to modify a circuit court's final order in a nonjury case, a posttrial motion must be filed within 30 days of the trial court's order). She concludes that Judge Jacobius lacked jurisdiction to determine the lien amount more than 30 days after the order approving sale.

¶ 14    While the circuit court does lose jurisdiction to modify a final order more than 30 days after the order is entered, the law also recognizes the court's inherent power to enforce its orders and decrees, even if it does so after the 30-day period. *Cities Services Oil Co. v. Village of Oak Brook*, 84 Ill. App. 3d 381, 384 (1980).

¶ 15    In *Armour & Co. v. Mid-America Protein, Inc.*, 37 Ill. App. 3d 75, 76 (1976), the mortgagee Armour filed a complaint that prayed for foreclosure, a personal deficiency decree, a judicial sale, and appointment for a receiver in the event of a deficiency. The circuit court entered a foreclosure judgment on the complaint, and a sheriff's sale was conducted. An order approving sale was entered by the circuit court on January 30, 1975. *Id.* Three months later, on April 30, 1975, Armour moved for entry of a deficiency decree against the defendants. *Id.* On August 1, 1975, the court entered a personal deficiency decree in the amount of $1,204,950.47, and the defendants appealed. *Id.* at 77. The defendants argued that the order approving sale was a final order and, thus, the court was prevented from entering the deficiency decree more than 30 days after the order approving sale. *Id.*

¶ 16    This court disagreed, reasoning that "[t]he law in Illinois is that the trial court retains jurisdictions [*sic*] in a case until it has disposed of all matters before the court." *Id.* The court noted that although the order was final, it did not dispose of all matters and thus the circuit court retained jurisdiction until all of the issues in the case, including the personal deficiency, were resolved. *Id.* Since Armour did not deny liability for the deficiency, the circuit court had jurisdiction to enter the decree. *Id.* at 78.

¶ 17    Here, the circuit court in its JOF specifically found that RBS had a valid and existing junior lien with the amount "TBD," and Talaganov did not deny liability for the lien. Even if the JOF did not expressly reserve the court's jurisdiction to determine the amount, it must be given that effect in order for the circuit court to dispose of all matters before it as set forth in the JOF. See also *Home State Bank/National Ass'n v. Potokar*, 249 Ill. App. 3d 127, 136 (1993) (finding that where the circuit court awarded attorney fees in its judgment but did not determine an amount, the court had jurisdiction to make that determination more than 30 days later, even though it did not expressly reserve jurisdiction to do so in the judgment). Therefore, we find that the circuit court here had jurisdiction to determine RBS's lien amount more than 30 days after the order approving sale.

¶ 18    Talaganov next argues that Judge Jacobius could not rule on RBS's petition because its lien amount was never adjudicated and he had no authority to determine the lien amount. We

note that Judge Jacobius tried to have the amount determined by Judge Loftus prior to considering RBS's petition, but Talaganov successfully argued before Judge Loftus that she had lost jurisdiction to determine the amount. RBS was then left to file its petition without a determination of its lien amount. In any event, we agree with Judge Jacobius's finding that a petition for turnover of surplus funds is a separate proceeding under section 15-1512 of the Code (735 ILCS 5/15-1512 (West 2016)), wherein he had the authority to determine the amount of an uncontested lien whose priority had been established in the JOF.

¶ 19 Our primary goal in interpreting a statute is to give effect to legislative intent as expressed by the language of the statute, given its plain and ordinary meaning. *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 21. To understand the intent of the legislature, we must read statutory provisions as a consistent whole. *Wilson v. Molda*, 396 Ill. App. 3d 100, 110 (2009). Section 15-1512 provides:

"§ 15-1512. Application of Proceeds of Sale and Surplus. The proceeds resulting from a sale of real estate under this Article shall be applied in the following order:

(a) the reasonable expenses of sale;

(b) the reasonable expenses of securing possession before sale, holding, maintaining, and preparing the real estate for sale ***;

(c) if the sale was pursuant to judicial foreclosure, satisfaction of claims in the order of priority adjudicated in the judgment of foreclosure or order confirming the sale; and

(d) remittance of any surplus to be held by the person appointed by the court to conduct the sale until further order of the court. If there is a surplus, such person conducting the sale shall send written notice to all parties to the proceeding advising them of the amount of the surplus, and that the surplus shall be held until a party obtains a court order for its distribution or until, in the absence of an order, the surplus is forfeited to the State." 735 ILCS 5/15-1512 (West 2016).

¶ 20 The title of section 15-1512, "Application of Proceeds of Sale and Surplus," shows an intent to treat surplus proceeds as a separate concern following a sale. *Id.* Subsections (a), (b), and (c) generally set forth the order in which the "proceeds resulting from a sale of real estate" will be applied, but make no mention of the distribution of surplus proceeds. *Id.* That issue is specifically addressed in subsection (d). The language of subsection (d) also indicates that the distribution of the surplus is a distinct process from the application of sale proceeds.

¶ 21 Subsection (d) states that after the judicial sale, "remittance of any surplus" is to be held "until further order of the court." *Id.* § 15-1512(d). Subsection (d) directs the party conducting the sale to "send written notice to all parties to the proceeding advising them of the amount of the surplus" and that "the surplus shall be held until a party obtains a court order for its distribution." *Id.* Subsection (d) does not establish a time frame for when a party must obtain such an order, other than before "the surplus is forfeited to the State." *Id.* It is "a fundamental rule of statutory construction that where there exists a general statutory provision and a specific statutory provision, *** both relating to the same subject, the specific provision controls." *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 459 (2002).

¶ 22 Talaganov argues that even if the surplus proceeding is a separate proceeding, subsection (c) limits the presiding judge's authority to distribute the surplus proceeds to adjudicated

claims that have an established amount of damages. We disagree. The language in subsection (c) does not refer to "adjudicated claims." Rather, it provides for the "satisfaction of claims in the order of priority adjudicated in the judgment of foreclosure or order confirming the sale." 735 ILCS 5/15-1512(c) (West 2016). The adjudicated issue in subsection (c) is the claim's order of priority. Here, RBS's lien priority was adjudicated in the JOF. Furthermore, subsection (d), which specifically addresses the distribution of surplus proceeds, contains no requirement that a party seeking distribution of the surplus must have adjudicated or proved up their claims prior to filing a petition for the surplus.

¶ 23    Talaganov also argues that Judge Jacobius had no authority to make new findings because subsection (d) only permits the circuit court to distribute the surplus funds in accordance with the findings of the mortgage foreclosure court. However, she cites no cases in support of her interpretation. Subsection (d) provides only that "the surplus shall be held until a party obtains a court order for its distribution." *Id.* § 15-1512(d). Subsection (d) does not limit the court to the findings of the mortgage foreclosure court in entering an order for distribution, and we decline to impose limitations not expressed by the statute's plain terms. See *Prazen v. Shoop*, 2013 IL 115035, ¶ 38 (courts will not presume the legislature intended to create a condition "where the statute is silent on the subject").

¶ 24    Our interpretation of section 15-1512 corresponds with the purpose and provisions of GAO 2003-03. The presiding judge of the chancery division adopted GAO 2003-03 pursuant to Illinois Supreme Court Rule 21(c) (eff. Dec. 1, 2008) (granting the chief judge authority to "enter general orders in the exercise of his or her general administrative authority"). See *OneWest Bank, FSB v. Markowicz*, 2012 IL App (1st) 111187, ¶¶ 14-15. GAO 2003-03 specifically governs petitions for the turnover of surplus proceeds in mortgage foreclosure cases, and its procedures address particular concerns involving the distribution of these proceeds. *Crown Mortgage Co. v. Young*, 2013 IL App (1st) 122363, ¶¶ 16-17. In order to "ensure the general integrity of the process," GAO 2003-03 reserves surplus distribution motions "to be heard only before the presiding judge himself" since his docket "is much less crowded than that of the foreclosure judges." *Id.* ¶ 19. It also provides that surplus distribution motions may not be presented "until at least 30 days has transpired since the entry of the Order Approving Sale." Cook County Cir. Ct. Gen. Adm. Order 2003-03 (Aug. 4, 2003).

¶ 25    As Talaganov acknowledges, GAO 2003-03 "is silent as to the permissibility of proving-up liens through the Petition for Surplus more than thirty days after the entry of the" order approving sale. Accordingly, nothing in GAO 2003-03 prevented Judge Jacobius, as the presiding judge, from determining RBS's lien amount when presented with a petition for the turnover of surplus funds. It is reasonable that the presiding judge, who is the only one tasked with hearing surplus petitions, has independent authority to consider evidence and make findings in furtherance of a fair and accurate determination of those petitions. We find that here, where the JOF had established RBS's junior lien, Judge Jacobius properly determined the lien amount pursuant to a petition for turnover of the surplus proceeds.

¶ 26    Talaganov contends, however, that RBS's lien cannot be the basis of its surplus petition where it was effectively "extinguished dues [*sic*] to their failure to prove-up the lien during the pendency of the action." She argues that RBS failed to preserve its right to the lien because the JOF's use of "TBD" as a "placeholder" for an actual damages amount was

insufficient. Therefore, the lien cannot be the basis of RBS's surplus petition. Talaganov cites *Nadhir v. Salomon*, 2011 IL App (1st) 110851, as support.

¶ 27    In *Nadhir*, this court found that the defendants were required to enter a dollar amount in damages to prevail on their claim because the Evanston Residential Landlord and Tenant Ordinance (ERLTO) explicitly provided that landlords itemize their damages and include specific dollar amounts. *Id.* ¶¶ 22, 26. *Nadhir* is factually distinguishable from the case at bar. The case before us does not involve the ERLTO, and as discussed above, neither section 15-1512(d) of the Code nor GAO 2003-03 require the prove-up of a lien amount prior to filing a petition for the distribution of surplus proceeds. Instead, we find *Kankakee Federal Savings & Loan Ass'n v. Mueller*, 134 Ill. App. 3d 943 (1985), and *JP Morgan*, 2015 IL App (1st) 140428, instructive.

¶ 28    In *Mueller*, the holder of a junior mortgage was made a party defendant in a mortgage foreclosure action, and the mortgagors did not deny the existence of this junior lien. *Mueller*, 134 Ill. App. 3d at 944. When the holder failed to answer the complaint or appear in the proceedings, it was defaulted prior to the foreclosure sale. *Id.* After the sale, a surplus remained, and the mortgagors filed a complaint alleging that they were entitled to the surplus. At this time, the junior lien holder filed an appearance with a verified motion showing the balance due on its junior mortgage. The trial court directed the sheriff to distribute the surplus funds to the junior lien holder. *Id.* On appeal, the mortgagors argued that by being defaulted prior to the foreclosure sale, the junior lien holder forfeited its right to assert the junior mortgage in the surplus proceeding. *Id.* at 945. This court disagreed, finding that "a foreclosure action is one in equity" and where "there is no dispute as to the [junior mortgage], which was admitted by way of answer by the [mortgagors]," and the court contemplated distribution of the surplus after the sale, the trial court's order distributing the surplus to the junior mortgage holder was not error. *Id.* at 946.

¶ 29    In *JP Morgan*, the lienholder did not appear or answer the foreclosure complaint and was defaulted. *JP Morgan*, 2015 IL App (1st) 140428, ¶ 45. Furthermore, the mortgagors also defaulted so no responsive pleadings were filed admitting the validity of the lien. *Id.* ¶ 50. As a result, the trial court found that the lienholder was not entitled to the surplus proceeds because it had not established a valid lien. *Id.* ¶ 48. This court affirmed the trial court's judgment, finding that *Mueller* was distinguishable because in that case, "the mortgagors had filed an answer admitting the junior mortgage holder's lien." *Id.* ¶¶ 48-49.

¶ 30    Following *Mueller* and *JP Morgan*, a party can establish a lien for the purpose of distributing surplus proceeds if (1) an affirmation was made during the proceedings, either in the allegations or in the answers to the foreclosure complaint, that the party possesses a valid lien; (2) there was no denial of the lien; and (3) the court contemplated that any surplus would be distributed after the sale. There is no requirement that the amount of the lien be proved up or adjudicated prior to distributing the proceeds. Here, not only did RBS answer the foreclosure complaint and allege it has a valid lien, the JOF specifically found that "RBS Citizens, National Association *** has a valid and subsisting lien in the amount of TBD, which lien is junior to the lien of the plaintiffs." Also, Talaganov did not deny the existence of RBS's lien in her answer to the foreclosure complaint, and the order approving sale contemplated that the distribution of surplus proceeds would occur after the sale. Accordingly, RBS properly established its junior lien, and Judge Jacobius's order distributing the surplus funds to RBS was not error.

¶ 31    Finally, Talaganov argues that principles of equity dictate that she be entitled to the surplus funds. Judge Jacobius found otherwise, reasoning that "[e]quity follows the law," and RBS was found to have a valid junior lien, which may be satisfied under Illinois foreclosure law. Judge Jacobius further found that $178,928.26 of unpaid principal remains on RBS's junior mortgage while the surplus amounts to $66,043.74. Thus, "RBS is entitled to the entire surplus." We find that Judge Jacobius's determination was not an abuse of discretion.

¶ 32    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 33    Affirmed.